Plaintiff, the owner of two pieces of real estate with improvements thereon located in the exclusive Shippan area of Stamford, has appealed from the action and ruling of the Board of Relief of the Town and City of Stamford refusing a reduction in the property assessment made by the assessors de valuation of land and improvements.
The complaint on appeal is in two counts. The first count relates to the action of the board respecting the "House Lot" *Page 242 
and improvements thereon located on the north side of Ocean Drive West, a highway; the second count to the action of the board respecting the "Shore Lot", bathhouse and swimming pool located on the south side of Ocean Drive West.
Upon the completion of the evidence the court, in company with counsel, visited the premises which are the subject of this tax appeal. Their beauty would merit poetic license in any writing and is touched upon at this phase of the memorandum to indicate to counsel that the court is not oblivious to those qualities of nature's handiwork and skilled architecture of man which gladdens the eye of artist, poet, philosopher and intelligent layman the world over (excepting of course at this time the nationals of Japan and Germany because of international complications).
Now to return to the matter at hand.
By law the assessors were required to assess plaintiff's dwelling house, land and other buildings at their "present true and actual valuation." Cum. Sup. [1935] § 364c.)
The statute provides that "the present true and actual value of any estate shall be deemed by all assessors and boards of relief to be the fair market value thereof, and not its value at a forced or auction sale." (Gen. Stat. [1930] § 1149.)
What is meant by the statutory words "actual" and "market value"? In Underwood Typewriter Co. vs. Hartford, 99 Conn. 329,336, the Supreme Court defined the words as follows: "Evidently the word `actual' [as employed in the statute] is used in the same sense as the word `just'.... It is also evident that the words `market value' in this statute mean a value in a market, in a place or in conditions in which there are, or have been or will be within a reasonable time, willing sellers and able and ready buyers of property like that to be assessed, and in which sales are or have been made, or may fairly be expected, in the usual and natural way of business."
In the later case of Portland Silk Co. vs. Middletown,125 Conn. 172, 174, the Supreme Court quoted with approval the "market value" definition in the Underwood case and, in addition, recognized the efficacy of a definition test approved in other jurisdictions, as follows: "A generally accepted definition of market value is `the price that would in all probability — the probability being based upon the evidence in the case — *Page 243 
result from fair negotiations, where the seller is willing to sell and the buyer desires to buy'." (Cases of other jurisdictions cited, including the United States Supreme Court.)
There may be situations, however, where "market value" of property is not ascertainable. In this contingency "`true and actual valuation' must therefore be determined by some other method of valuation." Lomas Nettleton Co. vs.Waterbury, 122 Conn. 228, 230, citing Underwood TypewriterCo. vs. Hartford, supra, p. 337.
The evidence has disclosed that plaintiff bought both properties with the improvements thereon in 1933. The "House Lot", so-called, is directly across the highway (Ocean Drive West) from the "Shore Lot", so-called. The latter lot is directly on Long Island Sound. The Sound is clearly observable from the front windows of the mansion (Spanish stucco style) which is located on the former lot. The mansion contains 13 rooms and a part of its structure is three stories high. For the past two and one-half years it has been occupied by a married niece of plaintiff who pays $200 a month rent. Some years ago the house was rented during the summer season for $2,400, which included the use and enjoyment of both properties by the lessees. In recent time plaintiff, whose place of business is in New York City, only visits weekends at the residence. It is fair to assume that the current rental basis is controlled by three considerations: (1) the accommodation of a married niece and her family; (2) the fact that property, in the nature of things, is better preserved by occupation than by non-occupation; and (3) some earned income to be applied on taxes is better than no income at all.
The grounds of both the "House Lot" and "Shore Lot" are beautiful and show that expert and diligent care has been taken in keeping them up. Flower beds, walks and terraces meet the approving eye of even a most critical observer. The mansion house is everything that an individual would or could desire in the way of habitation.
It appears that plaintiff has been anxious to sell his Shippan estate since 1935. Originally the first sale price he placed on both properties was $77,000. The only offer he has received to date relates to the "House Lot" property and the offer made was in the amount of $30,000 — and this was back in 1937. No offer of purchase was ever made respecting the *Page 244 
"Shore Lot" property. Realizing that a buyer cannot be found to approximate the $77,000 demand for both properties, plaintiff of more recent date is willing to dispose of both properties for a total figure of $40,000. The reduced figure to date has not been productive of an "able and ready buyer"
(paraphrasing the Underwood case) who "desires to buy"
(paraphrasing the Portland Silk Co. case).
On the grand list of October 1, 1941, the total assessment of both properties amounted to $63,740. The breakdown is as follows:
 "House Lot" House ........................... $25,140 Land ............................ 10,540 Garage .......................... 4,020 Green house ..................... 300 40,000 -------
 "Shore Lot" [*] Land ......................... $20,000 Pool ............................ 2,540 Bathhouse ....................... 1,200 23,740 ------- -------- Total ........................... $63,740
[*] Land (Oct. 1, 1941) originally assessed at $22,260 and board reduced assessment to $20,000 prior to this action.
It appears that in 1932 a general reassessment of all properties was undertaken in Stamford. The Municipal Service Co., Inc., was employed to perform this task by the municipal authorities. The method adopted respecting buildings and structures was that of reproduction cost less depreciation and obsolescence. It is sufficient to say that this method has been approved by our Supreme Court as one of the methods "of ascertaining the actual value of real estate for purposes of taxation." Lomas Nettleton Co. vs. Waterbury, supra, p. 231. This method was applied to plaintiff's buildings and structures. Plaintiff's house, incidentally, had been constructed in 1922.
Since 1932 the assessment of buildings and structures standing on plaintiff's land has decreased on the basis of the foregoing method of valuation. It also appears that litigation with the taxing authorities in 1934 resulted in a stipulation being *Page 245 
entered into between all parties in the Superior Court de certain reductions. The assessment on land was not affected by this stipulation.
Now to illustrate. In 1932 the mansion house was assessed at $47,540. The figure was arrived at in this way: reproduction cost (house built in 1922) — $50,570; depreciation — $3,030. Result: $47,540. Assessment as of October 1, 1941 — $25,140. It would serve no useful purpose to detail matters respecting the other structures.
Plaintiff's theory is that the fair market value of both properties is approximately $41,000 and that this figure represents the total actual value of both properties for taxation purposes. Under liberal rulings the court allowed some evidence to be offered respecting sales in the Shippan area during the last several years. Such evidence, however, cannot be permitted to control the issues in this case. The court has no knowledge of the facts and circumstances relating to those sales. At one stage in the trial the court remarked to counsel that it frequently happens that the owner of property, for one personal reason or another, disposes of his property at a great sacrifice. The element of "personal sacrifice" enters into the affairs of men more often than meets the eye, in a manner of speaking. Hence such sales, in the absence of other material subordinate facts expressly appearing, cannot be taken as a yardstick of measure.
To sustain this appeal would necessarily result in great harm. The system of assessment employed by the taxing authorities respecting land and buildings in the Shippan area is found to be just and equitable. The fact that plaintiff cannot dispose of his property to date even at the figure of $40,000 is for him most unfortunate, but not a controlling consideration of the issues of the case. Tersely stated, there is nomarket today for plaintiff's property. Large estates produce major problems for their owners. Among those problems are numbered the following: inability to secure in the market domestics to manage the large houses and ground men to keep up the appearances of extensive grounds; exorbitant cost of maintenance; smaller families; the providing of fuel. Other problems could be cited without difficulty.
In passing the court touches upon another aspect. Municipalities cannot properly function without income. Their sole *Page 246 
income is derived from the proceeds of taxes. So also, their yearly gross income must approximate a certain figure to allow them to perform properly the obligations imposed by an exacting society. This necessarily means that if individual assessments are reduced the tax rate must be increased. The net result, therefore, would be that the vast majority of taxpayers — the men and women who own modest homes — would have to bear additional burdens because of an increased tax rate. Jeremy Bentham (1748-1832), English lawyer, philosopher and political economist devoted the ripe years of his life advocating that "the greatest happiness of the greatest number is the foundation of morals and legislation." (Works, vol. X, p. 142.) This court, borrowing from Bentham's famous principle, makes this observation: In the decision of certain types of cases thatdecision which will be productive of the greatest happiness ofthe greatest number of people is the correct decision because itfinds support in the principles of moral law.
In conclusion the court pays tribute to counsel for their preparation of the case and the soundness of their learning and the sincerity of their advocacy.
Further discussion is unnecessary.
 Judgment will enter dismissing the appeal.